IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CYNTHIA HORNE, | ) | 4:07CV3152 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| SAINT ELIZABETH REGIONAL | ) | |
| MEDICAL CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

Cynthia Horne was employed by Saint Elizabeth Regional Medical Center ("St. Elizabeth") as an ultrasound technologist from April 2002 until February 2006.  On August 2, 2005, she suffered a workplace injury to her shoulder and, as a result, was off work for one week.  She returned to work under the hospital's alternate duty policy, which provided her with a temporary position for up to 12 weeks from the date of her return.  During this alternate duty period, Horne was never released to work more than four hours per day and was absent due to surgery for six weeks. When the alternate duty period expired, Horne was still subject to temporary restrictions and was unable to return to work on a full-time basis. On November 17, 2005, she was told that it would be necessary to replace her position, and she was changed from part-time to "as needed" status.  In February 2006, Horne requested that St. Elizabeth terminate her so that she could withdraw her retirement benefits. Pursuant to her request, she was terminated on February 10, 2006.

In this action, Horne claims that she was disabled under the Americans with Disabilities Act ("ADA"), and that St. Elizabeth's decision to hire a replacement and to change her employment status from part-time to "as needed" was discriminatory. She further claims that this decision was made in retaliation for her filing a claim under the Nebraska workers' compensation law.

*Material Facts*

St. Elizabeth has filed a motion for summary judgment and, in accordance with our local rules, has included in its supporting brief a statement of material facts, consisting of 20 numbered paragraphs with appropriate references to the pleadings, affidavits, and other filed evidentiary materials. *See* NECivR 56.1(a). Because Horne has not controverted this statement of material facts, it is deemed admitted. *See* NECivR 56.1(b)(1) ("Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response.") (emphasis in original). Thus, these material facts are undisputed:

1. Cynthia Horne is a resident of Lincoln, Nebraska. (Complaint, ¶4; Answer, ¶3)

2. St. Elizabeth is a Nebraska not-for-profit corporation which operates a hospital in the city of Lincoln, Nebraska. (Answer, ¶4)

3. Horne was hired by St. Elizabeth on March 20, 2002, as an Ultrasound Technologist in the Radiology & Radiation Therapy Department. (Answer, ¶5)

4. Ultrasound Technologists are also referred to as sonographers, because their principal duty involves making diagnostic medical sonograms. A sonogram is an ultrasound image of a body section, which is made using a probe (called a transducer). The Ultrasound Technologist places the transducer on the patient and moves or scans across the patient's body part to obtain the image. This requires the Ultrasound Tech to stand and use one hand, making significant movements of the wrist. Typically the Ultrasound Tech uses her other hand to operate a keyboard on the ultrasound machine. (Horne Dep., 25:17-31:19)

5. According to the Job Description, the "Physical Demands and Environmental Conditions" include:

2

- • Considerable mental and physical effort in job duties.
- • Must be able to move ultrasound equipment, physician equipment and patient from a standing position.
- • Some lifting work and occasional patient lifting.

(Horne Dep., Exhibit 2)  An Ultrasound Technologist spends much of a typical eight-hour day standing, walking and using the keyboard and transducer.  Technologists also assist with moving patients on and off the examining table, using the hospital's safe transfer practices.  They often transport the ultrasound machine to a patient's bedside to perform an examination.  In a normal eight-hour day, an Ultrasound Technologist will scan from five to twenty patients. (Horne Dep., 31:6-16)

6. Horne came into the Employee Health office at St. Elizabeth on August 4, complaining of back, shoulder, and neck pain after an incident that occurred at the hospital on August 2.  She met with Charlotte Osborn-Holm, a Registered Nurse in Employee Health. Ms. Osborn-Holm encouraged her to complete an incident report and to make an appointment to be seen at Company Care, the hospital's employee health provider. Ms. Horne was seen by a physician on August 5. (Osborn-Holm Aff., ¶5; Horne Dep. 21:18-24:15)

7. Horne filed a claim for Workers' Compensation after her injury in August 2005. (Horne Dep., 83:3-17)

8. Horne was released to return to work on restricted duty as of August 9.  The restrictions included lifting, pushing, and pulling a maximum of two pounds, no overshoulder reaching, and special accommodations.  The treatment plan limited her to working four hours per day. (Osborn-Holm Aff., ¶7 & Attachment B; Horne Dep., 34:13-36:12)

9. St. Elizabeth has an Alternate Duty policy, to enable injured employees to return to work as soon as it is medically appropriate, to perform productive tasks based on the employee's abilities, restrictions and limitations.  Under the terms of the policy, Horne was eligible to be assigned to a temporary Alternate Duty position "for up to 12 weeks

3

starting from the date of any work restrictions that preclude the associate from performing the essential functions of their job." (Osborn-Holm Aff., ¶4 & Attachment A)

10. When Horne was unable to perform the essential functions of her job due to the temporary restrictions placed on her on August 5, this started the running of her 12 weeks of eligibility for Alternate Duty. Horne remained on restricted duty until her status changed from full-time to PRN (as needed) status in mid-November. The work restrictions which were placed on her are summarized in a series of physician release forms which she submitted. (Osborn- Holm Aff., ¶8 & Attachment A)

11. On August 30, 2005, Horne had surgery by Patrick Clare, M.D., to repair her left shoulder. The purpose of the surgery was to correct the problem so that Horne could return to her job working eight hours per day. (Horne Dep., 2:12-43:2) Ms. Horne was off duty until mid-October and had periodic contact with Employee Health about her condition during September and early October. (Osborn-Holm Aff., ¶9 & Attachment A; Horne Dep., 37:19-38:1)

12. After a follow-up visit with Dr. Clare on October 13, Horne informed Ms. Osborn-Holm that she had been released to return to work with restrictions starting the next day. The "Work/School Status Report" completed by Dr. Clare showed that she was subject to "temporary restrictions-no lifting/pushing/pulling with L arm. Work 4-hour days until next OV [office visit] on 11/04/05." Based upon this physician release form, Ms. Horne was assigned to work a four-hour shift in the mornings upon her return. (Osborn-Holm Aff., ¶9; Horne Dep., 40:25-42:21, Exhibits)

13. When Horne had been given her initial restrictions, the hospital had suggested that she not work because of the portable procedures which were required and the need to use her left arm on the keyboard. As those restrictions were changed, the hospital accommodated her by allowing her to scan as long as she did not use her left arm for scanning. The hospital also released her from the

4

responsibility for doing portable procedures in the hospital, scheduling her for daily four-hour shifts at the hospital's outpatient center. Assigning her to the outpatient center reduced the risk associated with having to deal with critical or very sick patients. (Hopkins Aff., ¶6; Horne Dep., 36:18-37:11)

14. Horne saw Dr. Clare for another follow-up appointment on November 4. Dr. Clare continued her temporary restrictions until the next office visit which was scheduled on December 16, 2005. Horne stopped in to see Osborn-Holm after this physician appointment. Osborn-Holm noted that Horne had used up her 12 weeks of Alternate Duty according to the hospital's policy. Osborn-Holm discussed this situation with Horne and also notified Michael Hopkins, the Director of the Radiology & Radiation Therapy Department. (Osborn-Holm Aff., ¶10; Horne Dep., 14:11-46:14)

15. Hopkins understood from talking with Osborn-Holm that Horne remained subject to the temporary restrictions, including the prohibition against working more than four hours per day, and that Horne had not been released to return to her former job on a full-time basis. After receiving this information, Hopkins decided that he needed to hire a full-time Ultrasound Technologist. Rather than terminating Horne, he decided to change her status to "PRN" which meant that she would be called in to work as needed. He left open the possibility that she could return to work at some future date when the temporary medical restrictions were removed and she could perform all of the essential functions of the Ultrasound Technologist position. (Hopkins Aff., ¶7)

16. Hopkins met with Horne on November 17, 2005, to advise her that she had exhausted her Alternate Duty eligibility. He informed her that her status would be changed to PRN. After talking with Horne, Hopkins decided to change the effective date of the reassignment to PRN status to December 1, 2005, so that she would retain her eligibility for insurance benefits through the end of December 2005. (Hopkins Aff., ¶8, Horne Dep., 46:15-47:10)

5

17. When Hopkins moved Horne to on-call status on November 17, 2005, Horne believed that she would be able to return to work as a full-time Ultrasound Technologist, with restrictions that could be accommodated. She did not know what the extent of her permanent impairment might be or what accommodations would be required, if any. (Horne Dep., 48:16-51:5)

18. Horne had another follow-up appointment with Dr. Clare on January 9. He told her she could not return to work and signed a release form stating, "Continue to remain off work until further notice," which she delivered to the Employee Health Department. (Osborn-Holm Aff., Attachment B) Dr. Clare never provided any medical release form which indicated any conditions under which Horne could return to work for more than four hours per day. (Horne Dep., 107:17-108:22)

19. After December 1, Horne continued to work at St. Elizabeth, coming in for four-hour shifts as needed. (Horne Dep., 60:7-62:10) On February 10, 2006, Horne called Hopkins and requested that the hospital terminate her employment, so that she could withdraw funds from her retirement account to continue making payments on her health insurance. (Horne Dep., 77:4-78:5) She submitted a Notice of Resignation/Termination form stating that the reason for her resignation was "Financial Duress." (Horne Dep., Exhibit 7) Hopkins processed a similar form which showed that she had resigned due to "Disability/Medical/Internship," and that she was "Eligible for Rehire." (Id.) Hopkins told Horne that after she was released to return to work, he would be willing to rehire her for an open position. (Horne Dep., 79:7-80:13)

20. Horne applied for an received long-term disability insurance payments for several months after she left St. Elizabeth. (Horne Dep., 13:24-17:4; 76:9-77:3) In June 2006, she had another surgery to repair her shoulder. (Horne Dep., 63:10-64:10) In July 2006, she was released to work full time, but she has not reapplied to work at St. Elizabeth. (Horne Dep., 62:23-63:2; 64:8-17; 81:1-3) Since October 2006, she has worked for a company that supplies "traveling" employees, serving as

a full-time Ultrasound Technologist in hospitals in Renton, Washington; Norfolk, Virginia; and Bennington, Vermont. (Horne Dep., 4:2-6:16)

(Filing 18, at 3-10)

## DISCUSSION

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir.1994). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no

7

genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.

For the reasons discussed below, I conclude that St. Elizabeth is entitled to summary judgment on Horne's federal law claim, but that her retaliation claim may be actionable under Nebraska law. I therefore will dismiss the ADA claim with prejudice and, pursuant to 28 U.S.C. § 1367(c)(3), will decline to exercise supplemental jurisdiction over the retaliation claim, which will be remanded to the District Court of Lancaster County, Nebraska, where this case was on file prior to being removed to federal court by St. Elizabeth.

### *ADA Claim*

Under the ADA, employers are barred from discriminating "against a qualified individual because of the disability of such individual." 42 U.S.C. § 12112(a). To establish a prima facie case under the ADA, Horne must demonstrate (1) her condition qualifies as a disability within the meaning of the ADA, (2) she is qualified to perform the essential functions of her position with or without a reasonable

8

accommodation, and (3) she has suffered an adverse employment action due to her disability. *See Samuels v. Kansas City Missouri School Dist.*, 437 F.3d 797, 801 (8th Cir. 2006). St. Elizabeth argues, and I agree, that Horne cannot establish the first two elements of her prima facie case.

> The ADA defines a disability as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A). "Whether an impairment substantially limits a major life activity is a threshold question." *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1206 (8th Cir.1997). Evidence of a medical diagnosis of an impairment is insufficient. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). The impairment must be substantial, that is, considerable or to a large degree. *Id*. at 196, 122 S.Ct. 681. An individual's major life activities are substantially limited if she is unable to perform a basic function the average person in the general population can perform, or is significantly restricted in the condition, manner, or duration under which she can perform a major life activity as compared to an average person in the general population. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). . . .

> Furthermore, temporary impairments with little or no long-term impact are not disabilities. 29 C.F.R. § 1630.2(j)(2)(ii)-(iii). "The impairment's impact must ... be permanent or long term." *Toyota Motor*, 534 U.S. at 198, 122 S.Ct. 681. In determining whether a person is substantially limited in a major life activity, we consider (1) the nature and severity of the impairment, (2) its duration or anticipated duration, and (3) its actual or expected long-term impact. *Snow*, 128 F.3d at 1207 (citation omitted).

*Id.* at 801-02. Evidence of general temporary work restrictions, without more, is insufficient to constitute a disability within the meaning of the ADA. *Id.* at 803 (citing *Brunko v. Mercy Hosp.*, 260 F.3d 939, 941 (8th Cir. 2001)).

9

Horne's "inability to work while recovering from surgery is simply not evidence of a permanent impairment." *Heintzelman v. Runyon*, 120 F.3d 143, 145 (8th Cir. 1997). As of November 17, 2005, when the decision was made to replace Horne and to end her part-time alternate duty at the hospital, her work restrictions were stated by her physician to be temporary and it was still not known whether she would have any permanent impairment following her recovery from the August 30, 2005 shoulder surgery.

Horne asserts in her brief that the injury to her shoulder "resulted in work limitations that still required accommodations as of October 16, 2007, the date of [her] Deposition" (filing 22 at 5), but she does not provide any evidence to support this assertion.[1] It appears, however, that the only accommodation Horne received while working as an ultrasound technologist at other hospitals after July 2006 was that she had someone help her in transporting and lifting patients. (Horne Dep. (filing 17-9) at 5:3-7:4)

"An individual does not prove that he or she has a disability simply by showing an impairment that makes it impossible to do his or her particular job without accommodation." *Nuzum v. Ozark Automotive Distributors, Inc.*, 432 F.3d 839, 842 (8th Cir. 2005). Furthermore, the Eighth Circuit has "said flatly that restrictions on lifting will not be enough to establish disability." *Id.* at 844-45 (citing *Mellon v. Fed.*

---

[1] Under our local rules, it is required that "[e]very factual assertion in the opposing brief shall cite to the pertinent page of the pleading, affidavit, deposition, discovery material, or other evidence relied on by the non-moving party." NECivR 7.1(b)(2)(A). More particularly, in responding to a motion for summary judgment, an opposing party's brief must "contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies." NECivR 56.1(b)(1). These are not mere "form" requirements for which a party's nonwillful failure to comply is excusable under Federal Rule of Civil Procedure 83(a)(2). *See Cordray v. 135-80 Travel Plaza, Inc.*, 356 F. Supp. 2d 1011, 1016 n. 6 (D. Neb. 2005).

10

*Express Corp.*, 239 F.3d 954, 957 (8th Cir. 2001) (rejecting as a matter of law a disability claim based on the premise that the plaintiff "cannot lift more than 15 pounds and should avoid other such stresses with her right arm"); *Wenzel v. Missouri-Am. Water Co.*, 404 F.3d 1038, 1041 (8th Cir.2005) ("A lifting restriction, without more, is not a disability."); *Conant v. City of Hibbing*, 271 F.3d 782, 785 (8th Cir.2001) (per curiam) ("This court has repeatedly held that the type of work restriction at issue in this case [no lifting more than 30 pounds and no repeated bending or squatting] does not amount to a 'disability' within the meaning of the ADA."); *Brunko v. Mercy Hosp.*, 260 F.3d 939, 941 (8th Cir.2001) ("Although lifting itself is identified as a major life activity, this court has held that a general lifting restriction without more is insufficient to constitute a disability within the meaning of the ADA."); *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1207 (8th Cir.1997) ("While lifting is noted under the regulations as a major life activity, a general lifting restriction imposed by a physician, without more, is insufficient to constitute a disability within the meaning of the ADA.")).

Even if there were a triable issue in this case as to whether Horne's shoulder injury qualifies as a disability, the evidence establishes that she was not qualified to perform the essential functions of her job on November 17, 2005. Horne was still restricted to working four hours per day and could not do any lifting, pushing, or pulling with her left arm. It was because these same restrictions that St. Elizabeth over 3 months earlier had placed Horne on temporary alternative duty and allowed her to work part-time. "An employee who has a full-time position, but who is only able to return to work on a part-time basis, is not qualified to perform the essential functions of their full-time position." *Brooks v. Laboratory Corp. of America*, 2005 WL 2250827, *14 (W.D.Mo. Sep. 15, 2005) (citing *Hatchett v. Philander Smith College*, 251 F.3d 670, 673-75 (8th Cir.2001)). *See also Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1048 (8th Cir. 1999) (employer entitled to judgment as a matter of law on ADA claim where plaintiff made no showing that the essential functions of her full-time job could be performed in four hours); *Burnett v. Western*

11

*Resources, Inc.*, 929 F.Supp. 1349, 1356-57 (D.Kan.1996) (plaintiff who was restricted to four hours per day walking was not qualified for full-time meter reader position) (cited with approval in *Hatchett* and *Browning*).  The ADA did not require St. Elizabeth to extend Horne's period of part-time alternative duty or to keep her full-time regular position open any longer.

### *State-Law Retaliation Claim*

In *Jackson v. Morris Communications Corp.*, 657 N.W.2d 634, 641 (Neb. 2003), the Nebraska Supreme Court held that an action for retaliatory discharge is allowed when an employee has been discharged for filing a workers' compensation claim.  Such a claim is analyzed using the burden-shifting analysis which originated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Riesen v. Irwin Indus. Tool Co.*, 717 N.W.2d 907, 913-14 (Neb. 2006).  First, the plaintiff has the burden of proving a prima facie case of discrimination. Second, if the plaintiff succeeds in proving that prima facie case, the burden shifts to the defendant-employer to articulate some legitimate, nondiscriminatory reason for the plaintiff's rejection or discharge from employment.  Third, assuming the employer establishes an articulated nondiscriminatory reason for disparate treatment of an employee, the employee maintains the burden of proving that the stated reason was pretextual and not the true reason for the employer's decision; i.e., that the disparate treatment would not have occurred but for the employer's discriminatory reasons.  *Id.* at 914-15.

In support of its motion for summary judgment, St. Elizabeth argues only that Horne is unable to establish a prima facie case of retaliation.  "To establish a prima facie case of unlawful retaliation, an employee must show that he or she participated in a protected activity, that the employer took an adverse employment action against him or her, and that a causal connection existed between the protected activity and the adverse employment action."  *Id.* at 915.  "The burden of proof for a prima facie case of retaliatory discharge for filing a workers' compensation claim is on the

employee." *Id.* St. Elizabeth argues that Horne cannot show a causal connection between her filing a workers' compensation claim after her injury in August 2005 and the alleged adverse employment action that was taken on November 17, 2005.

Although both parties rely exclusively upon Eighth Circuit precedent, the sufficiency of the evidence in a diversity case is determined with reference to state law. *See Burke v. Deere & Co.*, 6 F.3d 497, 511 (8th Cir. 1993). In this regard, the Nebraska Supreme Court has specifically stated that "[i]n cases involving retaliatory discharge for filing a workers' compensation claim, a claimant's prima facie case is not an onerous burden under the *McDonnell Douglas* burden-shifting scheme." *Riesen*, 717 N.W.2d at 916-17 (internal quotations and citations omitted).

In *Riesen*, even though almost a year had elapsed between the date of the claimant's compensable injury and his termination of employment, the Nebraska Supreme Court concluded that a prima facie case was established because the claimant, who "had received several positive work performance reviews and pay increases from his employer[, ...] was fired just 2 days after he notified [his employer] that after nearly 12 months of medical treatment and accompanying workers' compensation benefits, he needed more surgery on his shoulder." *Id.* at 916. The Nebraska Supreme Court stated as a general rule that: "A plaintiff supports an assertion of retaliatory motive by demonstrating proximity in time between the workers' compensation claim and the firing, along with evidence of satisfactory work performance and supervisory evaluations." *Id.*

Based upon the Nebraska Supreme Court's holding in *Riesen*, it is difficult to conclude as a matter of law that Horne cannot establish a prima facie case of retaliation. *See also Tanner v. Nebraska Health System*, 2007 WL 1898560, *3-5 (Neb.App. July 3, 2007) (finding sufficient evidence of causal connection where claimant filed for workers' compensation benefits in February 2000, returned to work in April, was taken off "light-duty" restriction in early June, and was terminated on

13

June 12; additional factors were that claimant's supervisor knew that she faced additional surgery, he made a negative statement regarding the cost of workers' compensation benefits, and claimant was the only employee whose job was eliminated due to departmental "restructuring").

Because it is not readily apparent that St. Elizabeth is entitled to summary judgment on the state-law retaliation claim, and because the ADA claim which allowed this case to be removed to federal court is being dismissed, I conclude that I should not rule on the merits of the state-law claim, but instead should remand the case to state court pursuant to 28 U.S.C. § 1367(c)(3) (providing that the district court may decline to exercise supplemental jurisdiction where it has dismissed all claims over which it has original jurisdiction).  In making this determination, I am mindful that it was just 5 years ago that the Nebraska Supreme Court "recognize[d] a public policy exception to the at-will employment doctrine and allow[ed] an action for retaliatory discharge when an employee has been discharged for filing a workers' compensation claim."  *Jackson*, 657 N.W.2d at 641.  Thus, there are only a limited number of reported Nebraska decisions on this topic.  I also note that Horne's case does not involve a straightforward firing.

When a district court dismisses federal claims over which it has original jurisdiction, the balance of interests usually "will point toward declining to exercise jurisdiction over the remaining state law claims."  *In re Canadian Import Antitrust Litigation*, 470 F.3d 785, 792 (8th Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)).  *See also Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir. 2006) ("Congress unambiguously gave district courts discretion in 28 U.S.C. § 1367(c) to dismiss supplemental state law claims when all federal claims have been dismissed, . . ..").  Indeed, the Court of Appeals has "stress[ed] the need to exercise judicial restraint and avoid state law issues wherever possible."  *Gregoire v. Class*, 236 F.3d 413, 420 (8th Cir. 2000) (quoting *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir.1990).  "[W]hen state and federal claims are joined and all federal

claims are dismissed on a motion for summary judgment, the state claims are ordinarily dismissed without prejudice to avoid needless decisions of state law . . .." *Id.* at 420-21 (quoting *ACLU v. City of Florissant*, 186 F.3d 1095, 1098-99 (8th Cir.1999).  Because this case was removed from state court, it will be remanded rather than dismissed.  *See, e.g., Porter v. Williams*, 436 F.3d 917, 920 (8th Cir. 2006) (once the district court granted partial summary judgment, it had discretion either to remand *sua sponte* the remaining state-law claims or to keep them in federal court).

### *CONCLUSION*

Horne cannot establish a prima facie case under the ADA because there is insufficient evidence that she had a disability or that she was able to perform the essential functions of her job, with or without accommodation.  Whether she can establish a prima facie case of retaliation under Nebraska law is not decided.

Accordingly,

IT IS ORDERED that the defendant's motion for summary judgment (filing 16) is granted in part and denied in part, as follows:

      1.     The motion is granted with respect to the plaintiff's federal law claim brought under the Americans with Disabilities Act, and such claim is dismissed with prejudice.

      2.     The motion is denied without prejudice with respect to the plaintiff's state-law retaliation claim, and, pursuant to 28 U.S.C. § 1367(c)(3), such claim is remanded to the District Court of Lancaster County, Nebraska.

15

3.     The clerk of the court shall mail a certified copy of this order to the Clerk of the District Court of Lancaster County, Nebraska, and may take any other action necessary to effectuate the remand.

4.     Judgment shall be entered by separate document.

March 10, 2008.                          BY THE COURT:

                                         s/ *Richard G. Kopf*
                                         United States District Judge

16